**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-01999 |
| | ) | |
| CONSTRUCT DATA PUBLISHERS a.s., | ) | |
| a foreign corporation, also doing business as | ) | Judge Andrea R. Wood |
| FAIR GUIDE, | ) | |
| | ) | |
| WOLFGANG VALVODA, individually and | ) | |
| as an owner, officer, or director of | ) | |
| CONSTRUCT DATA PUBLISHERS a.s., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUSANNE ANHORN, individually and as | ) | |
| an owner, officer, or director of | ) | |
| CONSTRUCT DATA PUBLISHERS a.s., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Federal Trade Commission ("FTC") has sued Defendants Construct Data Publishers ("Construct Data"), Wolfgang Valvoda ("Valvoda"), and Susanne Anhorn ("Anhorn") under the FTC Act ("FTCA"), 15 U.S.C. § 41 *et seq.*, alleging that they engaged in a plan fraudulently to induce businesses and nonprofit organizations in the United States and other countries to pay for unordered listings in an Internet directory. The defendants initially appeared in this case through counsel, but subsequently directed that counsel to withdraw and then defaulted. Thereafter, the Court entered a default judgment in the amount of $9.1 million and imposed a permanent injunction that, *inter alia*, froze the defendants' assets. Now appearing through new counsel, the defendants have filed the Motion to Vacate Default Judgment and Order for Permanent Injunction ("Motion to Vacate") (Dkt. No. 57) and the Motion to Modify

the Asset Freeze Order ("Motion to Modify") (Dkt. No. 68). For the reasons discussed below, the Motion to Vacate is granted and the Motion to Modify is denied without prejudice.

## BACKGROUND

On March 14, 2013, the FTC filed a Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") against Valvoda and Anhorn (together, the "Individual Defendants"), as well as Construct Data (together with the Individual Defendants, "Defendants"). The Complaint alleges that Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by engaging in deceptive practices in the marketing and selling of Internet directory listings to small businesses and organizations that participate in trade shows and exhibitions. Specifically, the Complaint alleges that Defendants targeted consumers in the United States and other countries with mailings falsely representing (1) that the consumers had a preexisting business relationship with Defendants; and (2) that Defendants were affiliated or otherwise connected with a particular trade show or exhibition, or the organizer of that event. Along with the Complaint, the FTC filed a motion for an *ex parte* temporary restraining order supported by witness declarations, consumer complaints, court orders, and other evidence that Defendants engaged in practices that violated Section 5(a).

The Court issued an *ex parte* temporary restraining order on March 15, 2013 (the "TRO"), which, among other things, enjoined Defendants from engaging in the activities that the FTC alleged violated Section 5(a) and froze Defendants' assets. The asset freeze allowed the Individual Defendants to "pay from their individual personal funds reasonable, usual, ordinary, and necessary living expenses," subject to the prior written agreement of the FTC. (TRO at 8-9, Dkt. No. 14.) The FTC subsequently provided each Defendant with copies of the Complaint, the TRO, and other court filings, as well as notice of the preliminary injunction hearing.

At the preliminary injunction hearing on April 17, 2013, defense counsel stated that Defendants, "after making a considered decision," would not present evidence, but would instead "focus efforts and resources towards either litigating this matter on the merits or attempting to settle." (Apr. 17, 2013 Tr. at 5, PX 13, Dkt. No. 71-4.) Defendants' counsel further represented that the decision was based on the "success rate of challenging a preliminary injunction in the wake of an ex parte TRO" and "resources." (*Id.*) The Court then granted the preliminary injunction, which continued the asset freeze and other relief that had been granted previously in the TRO. The preliminary injunction order allowed the Individual Defendants to continue to pay their reasonable living expenses from their personal funds, after providing financial statements and an accounting as required by that order and subject to the prior written agreement of the FTC.

On June 10, 2013, the FTC served Construct Data and Anhorn with process in Slovakia pursuant to the Hague Convention. At the next status hearing on July 11, 2013, defense counsel acknowledged service of process as to those Defendants and requested that the Court grant them an additional 14 days to answer the Complaint. The Court granted the extension and set July 25, 2013 as the deadline for their answer. No answer was ever filed, however.

On August 19, 2013, defense counsel moved to withdraw from its representation of Valvoda, citing his failure to respond to communications. The Court granted that motion at a hearing on August 22, 2013. At the same hearing, defense counsel informed the Court that his remaining clients, Construct Data and Anhorn, would not be filing an answer or responsive pleading. On October 30, 2013, defense counsel moved to withdraw from representing Construct Data and Anhorn because "they no longer wish[ed] to continue to be represented by counsel in this proceeding" and had requested that defense counsel withdraw. (Mot. to Withdraw at ¶ 3,

3

Dkt. No. 37.) On November 6, 2013, the FTC moved for entry of default against Construct Data and Anhorn, serving notice on all parties. At a motion hearing on November 13, 2013, defense counsel stated with regard to his withdrawal motion: "Essentially, we concede. It's not so much that defendants want to switch counsel, want new counsel, they are opting to no longer have counsel at all." (Nov. 13, 2013 Tr. at 2, PX 16, Dkt. No. 71-4.) The Court granted the motion to withdraw and entered orders of default against Construct Data and Anhorn.

The FTC served Valvoda with process on November 15, 2013. When he failed to respond, the FTC moved for entry of default against him on December 20, 2013, again serving notice on all parties. Valvoda again failed to respond, and the Court entered the requested default order on January 7, 2014. On January 30, 2014, the FTC filed its motion for a default judgment against all Defendants, along with a declaration from its investigator addressing the appropriate amount of monetary relief—approximately $9.1 million, which represented the FTC's "estimate of Construct Data's sales revenue during the years 2005 through 2013." (Supp. Menjivar Decl. at ¶ 3, Dkt. No. 52-1.) The FTC served its motion, supporting declaration, and proposed default judgment on all Defendants. None responded. The hearing on the FTC's motion was held on February 11, 2014. Defendants did not appear, and the Court entered an order granting a default judgment and permanent injunction. The permanent injunction did not independently detail any asset freeze order. Instead, it incorporated by reference the asset freezes imposed by the TRO and preliminary injunction.

The FTC served copies of the order granting the default judgment and the permanent injunction on Defendants on February 11, 2014. On March 11, 2014, current defense counsel entered an appearance on behalf of all Defendants and filed the Motion to Vacate. This was followed on April 1, 2014 by the Motion to Modify.

**DISCUSSION**

I.   **The Motion to Vacate**

Defendants argue that the default judgment and permanent injunction should be vacated with respect to the Individual Defendants because the Court lacks personal jurisdiction over them, and with respect to all Defendants because there is good cause to do so. As discussed below, in light of the current record, the Court concludes that it may exercise personal jurisdiction over the Individual Defendants. However, the Court nonetheless finds that good cause exists to vacate the default judgment and permanent injunction.

A.   **Personal Jurisdiction**

Defendants first argue that the default judgment should be vacated as to the Individual Defendants because the Court lacks personal jurisdiction over them. "When a district court enters a default judgment without personal jurisdiction over the defendant, 'the judgment is void, and it is a *per se* abuse of discretion to deny a motion to vacate that default judgment.'" *be2 LLC v. Ivanov*, 642 F.3d 555, 557 (7th Cir. 2011) (citing *Relational, LLC v. Hodges*, 627 F.3d 668, 671 (7th Cir. 2010)). Because they had notice of this lawsuit and still defaulted, the Individual Defendants have the burden of proving the absence of personal jurisdiction. *Id.* They have failed to meet this burden.

Due process requires that a nonresident defendant have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The contacts between the defendant and the forum state may not be "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). Instead, "the sufficiency of the contacts is measured by the defendant's

purposeful acts." *NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 580 (7th Cir. 1994). Parties establish minimum contacts when they "purposefully avail" themselves of "the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted). Because modern business often is transacted solely by mail and wire communications, physical presence is not required to create such minimum contacts. *Id.* at 476. Depending on the nature of the contacts, a court may exercise general or specific jurisdiction over defendants. Here, the FTC does not argue for the exercise of general jurisdiction over the Individual Defendants; rather, it contends that the Court may exercise specific personal jurisdiction. Specific personal jurisdiction exists if the contacts with a forum "arise out of or relate to" the plaintiff's claims. *Id.* at 472-73 (citation omitted).

The FTCA provides that "[i]n any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found." 15 U.S.C. § 53(b). This language permits nationwide service of process. *FTC v. Cleverlink Trading Ltd.*, No. 05 C 2889, 2006 WL 1735276, at *3 (N.D. Ill. June 19, 2006) (citing *FTC v. Bay Area Bus. Council, Inc.*, No. 02 C 5762, 2003 WL 21003711, at *2 (N.D. Ill. May 1, 2003)). When nationwide service is authorized by federal law, the relevant question for purposes of personal jurisdiction becomes whether the defendant has minimum contacts with the United States. *See Fitzsimmons v. Barton*, 589 F.2d 330, 332 (7th Cir. 1979); *Zurich Capital Mkts. v. Conlianese*, 388 F.Supp.2d 847, 857 (N.D. Ill. 2004).

Here, it is clear from the record that both Individual Defendants purposefully availed themselves of the privilege of conducting business activities within the United States and that those activities relate to the claims brought by the FTC. For example, in connection with the

Motion to Vacate, each of the Individual Defendants submitted a declaration. Anhorn's declaration states that:

- she has served as the CEO of Construct Data since January 1, 2011, and in this position she is responsible for the day-to-day operations of the company (Anhorn Decl. at ¶¶ 2, 5, Dkt. No. 62);

- in her capacity as CEO, Anhorn communicated with the U.S. company MicroDynamics to instruct it to print Construct Data's customer mailings and collect responses to Construct Data's mailings (*id.* at ¶¶ 15, 16);

- Construct Data had over 22,500 contracts with U.S. customers over the span of 2009-2013 (*id.* at ¶ 21); and

- 55% of Construct Data's revenues came from U.S. customers (*id.* at ¶ 22).

Meanwhile, Valvoda's declaration represents that:

- he was the CEO of Construct Data until December 31, 2010[1] (Valvoda Decl. at ¶ 2, Dkt. No. 61);

- while acting as CEO, Valvoda was responsible for day to day operations of the company (*id.* at ¶ 4); and

- in his capacity as CEO, Valvoda communicated with MicroDynamics, which he describes as "Construct Data's U.S.-based business partner" (*id.* at ¶ 13).

The FTC also obtained documents from MicroDynamics pursuant to a Civil Investigative Demand that show that both Individual Defendants had extensive personal communications with MicroDynamics, directing that company to print and disseminate direct mail campaigns on behalf of Construct Data. To take just a few illustrative examples, the FTC's documents show that Anhorn e-mailed MicroDynamics personnel to provide them with the content and timing of mailings that MicroDynamics was supposed to send on behalf of Construct Data. (Dkt. No. 71-2 at 44-48, 52-56). She also personally approved a 50,000-piece mailing (Dkt. No. 71-3 at 13), and approved proofs and mailing dates. (Dkt. No. 71-2 at 50). This evidence also indicates that

---

[1] Valvoda does not specify when he began his tenure as Construct Data's CEO.

Valvoda personally communicated with MicroDynamics to arrange for the printing and dissemination of a direct-mail campaign of approximately 200,000 pieces. (Dkt. No. 71-1 at 52-55.) After some time working with MicroDynamics, Valvoda wrote to a MicroDynamics employee that, "[t]he previous mailing campaigns were successful and therefore I would like to increase our profit in the US-market." (Dkt. No. 71-2 at 8-9.)

Based on these facts, it is apparent that both Valvoda and Anhorn purposefully availed themselves of the privilege of conducting business activities in the United States. The Individual Defendants purposefully directed MicroDynamics to prepare and disseminate marketing materials. They determined the text of these materials, to whom they were disseminated, and the manner in which they were sent. Thus, the actions of the Individual Defendants are sufficient to create minimum contacts in the United States. Furthermore, the Individual Defendants' purposeful contacts with the United States—orchestrating the dissemination of direct mail communications—is the same activity that the FTC challenges as fraudulent. Thus, the Court may exercise specific personal jurisdiction over the Individual Defendants. *See, e.g.*, *Travelers Health Ass'n v. Commonwealth of Va. ex rel. State Corp. Comm'n*, 339 U.S. 643 (1950) (solicitation of business in a forum can support an exercise of personal jurisdiction in that forum); *Metro Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 572–73 (2d Cir. 1996) (direct mail campaign within forum supported finding of specific jurisdiction over defendant in suit that arose out of that campaign).

That the Individual Defendants were working on behalf of Construct Data does not shield them from the Court's exercise of personal jurisdiction. Although jurisdiction over a corporation does not automatically extend to its officers, the Supreme Court has rejected the theory "that employees who act in their official capacity are somehow shielded from suit in their individual

capacity." *Keeton*, 465 U.S. at 781 n.13. Rather, each defendant's contacts "must be assessed individually." *Id.* Here, the extent of the Individual Defendants' personal involvement in directing Construct Data's activities in the United States makes them susceptible to suit before this Court. *See, e.g., FTC v. 1492828 Ontario, Inc.*, No. 02 C 7456, 2003 WL 21038578, at *4 (N.D. Ill. May 7, 2003) (court had personal jurisdiction over "passive investor" and president of Canadian corporation where that president "no doubt knew that his corporation was soliciting American customers, and could have anticipated litigation in an American court."); *Sullivan v. Rilling*, No. 94 C 539, 1994 WL 684767, *6 (N.D. Ill. Dec. 6, 1994) (corporate officers who direct corporate activities toward a forum are subject to personal jurisdiction there).

None of the Individual Defendants' arguments to the contrary are persuasive. For instance, the Individual Defendants argue that the printing contracts with MicroDynamics cannot form the basis for personal jurisdiction because "MicroDynamics is a non-victim business that entered into a contractual relationship with Construct Data," and because "this is not a breach of contract action between MicroDynamics and the Individual Defendants . . . [,] [t]he Individual Defendants' contacts with MicroDynamics are too attenuated from the FTC's claims to establish personal jurisdiction." (Defs.' Reply in Supp. of Mot. to Vacate at 12, Dkt. No. 74.) As described above, however, the gravamen of the Complaint is that the Individual Defendants sent fraudulent mailings to targeted consumers in the United States. The FTC has marshaled evidence that the Individual Defendants directed MicroDynamics to produce and disseminate the mailings at issue. Furthermore, the Individual Defendants cite no case law supporting their contention that MicroDynamics's status as a "non-victim business" affects the personal jurisdiction analysis. Equally unavailing is the Individual Defendants' argument that there is no evidence that either Individual Defendant personally communicated with a potential customer. Even accepting,

9

*arguendo*, the truth of this statement, it is of no legal significance given that they both orchestrated (with a great deal of exactitude) a direct mailing campaign to reach hundreds of thousands of U.S. consumers.

In short, given the record before the Court, the Individual Defendants have not met their burden of showing that the default judgment should be vacated for lack of personal jurisdiction.

### B. Motion to Vacate Default Judgment Pursuant to Rule 60(b)

The Seventh Circuit favors trial on the merits over default judgment. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 631 (7th Cir. 2009) (citations omitted). Rule 60(b) of the Federal Rules of Civil Procedure allows a court to vacate a default judgment. *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 44-45 (7th Cir. 1994). But for a court to do so, the movant must demonstrate (1) good cause for the default; (2) quick action to correct it; and (3) a meritorious defense to the complaint. *Zuelzke Tool & Eng. Co., Inc. v. Anderson Die Castings, Inc.*, 925 F.2d 226, 229 (7th Cir. 1991) (citing *U.S. v. DiMucci*, 879 F.2d 1488 (7th Cir. 1989)). Failure to make any one of these showings warrants denial of a motion to vacate. *See Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 811 (7th Cir. 2007). Because Defendants satisfy all three, the Court finds that the default judgment should be vacated.

#### 1. Good Cause

A party establishes good cause to vacate a default judgment by showing that "it did not willfully ignore the pending litigation, but, rather, failed to respond to the summons and complaint through inadvertence." *Cracco*, 559 F.3d at 631. The good cause standard does not mean that a defaulting party needs to demonstrate a good reason for the failure that led to the default in order to have that default set aside. *Sims v. EGA Prods., Inc.*, 475 F.3d 865, 868 (7th Cir. 2007). Vacating a default judgment "requires 'good cause' for the judicial action, not 'good

cause' for the defendant's error; as used in this Rule, the phrase is not a synonym for 'excusable neglect.'" *Id.* Put simply, the Court must find a good reason to vacate the judgment.

In this case, the disproportionate size of the default judgment—$9.1 million—in comparison with the minimal prejudice suffered by the FTC represents good cause to vacate the default judgment and permanent injunction. "A default judgment is a sanction for misconduct during the litigation." *Sims*, 475 F.3d at 868. Thus, "[d]amages disproportionate to the wrong afford good cause for judicial action, even though there is no good *excuse* for the defendant's inattention to the case." *Id.* (emphasis in original); s*ee also Sun*, 473 F.3d at 811 ("a default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing."). Thus, in *Sims*, the Seventh Circuit affirmed *vacatur* of a $31 million default judgment where the default caused the plaintiffs minimal prejudice—essentially only "extend[ing] th[e] suit by a few months." 475 F.3d at 869. Other Seventh Circuit decisions have similarly indicated that a high-value default judgment warrants a high level of scrutiny by a district court. *See, e.g., Bieganek v. Taylor*, 801 F.2d 879, 881 (7th Cir. 1986) (noting that "[t]he size of the judgment is not controlling, but it deserves to be considered" and holding that the district court abused its discretion by not vacating a $250,000 default judgment).

The present case presents a situation similar to that in *Sims*. A default judgment in the amount of $9.1 million has been entered in a case where the Court discerns little actual prejudice to the FTC. The asset freezes imposed by the TRO, the preliminary injunction, and the permanent injunction have maintained the *status quo*. The only apparent prejudice to the FTC is a delay in the resolution of the case, and the costs of briefing the default judgment motion and its opposition to the Motion to Vacate. The Court will allow the FTC to submit a brief suggesting an appropriate sanction against Defendants—such as having to pay attorneys' fees and costs

11

associated with the additional briefing necessitated by the abortive default—but the $9.1 million judgment is a grossly excessive penalty.

The Individual Defendants have also filed supplemental declarations in which they represent that the default judgment was the result of inadvertence and ignorance, which also represents good cause to vacate the default judgment. Anhorn testified in her affidavit that she is unfamiliar with U.S. litigation and did not understand the effect of not participating in the case until after default judgment was entered, and that although she was represented by counsel prior to default, she had suffered from "a fundamental communication breakdown" with prior counsel. (Defs.' Reply Br. in Supp. of Mot. to Vacate, Ex. B at ¶¶ 4-6, Dkt. No. 74.) Valvoda similarly testifies in his affidavit that he is unfamiliar with U.S. litigation, did not understand the effect of not participating in the case until after default judgment was entered, and was never represented by counsel. (Defs.' Reply Br. in Supp. of Mot. to Vacate, Ex. C at ¶¶ 4-6, Dkt. No. 74.) The facts establish good cause to vacate the default judgment by showing that Defendants failed to respond to various filings due to inadvertence and incomprehension. *See, e.g., Dismissed Relator v. Murchison*, No. 11-3279, 2012 WL 1135651, at *2 (C.D. Ill. Apr. 4, 2012) (vacating $1.2 million default judgment where the defendant was "an elderly person" who claimed "she did not understand the documents with which she was served," and where court found the default judgment "disproportionate to Defendants' inattention to the case"); *Christiansen v. Adams*, 251 F.R.D. 358, 360 (S.D. Ill. 2008) ("ignorance and misinterpretation" of the law "constitutes good cause" to set aside default); *E. & J. Gallo Winery v. Cantine Rallo, S.p.A.*, 430 F. Supp. 2d 1064, 1089 (E.D. Cal. 2005) (vacating default judgment where "nothing in the record indicates that Rallo, an Italian Company with limited business in the United States was familiar with legal

processes in the United States or, apart from this case, that Rallo was or ever has been involved in litigation in the federal courts").[2]

In light of the large amount of the default judgment, as well as the Individual Defendants' declarations supporting the position that their default was inadvertent and the product of a lack of comprehension of the U.S. civil litigation process, the Court finds good cause to vacate the default judgment and permanent injunction.

### 2. Quick Action to Correct Default

The Court also finds that Defendants have taken quick action to correct the default. The default judgment was entered on February 11, 2014. Defendants filed their motion to vacate 28 days later on March 11, 2014. "When there has been good cause for delay, and there has been no prejudice to the other party, the Seventh Circuit has upheld a ten week delay as sufficiently quick to warrant vacating a default judgment." *Bluegrass Marine, Inc. v. Galena Rd. Gravel, Inc.*, 211 F.R.D. 356, 359 (S.D. Ill. 2002) (citing *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792 (7th Cir. 1980)). Moreover, as noted above, the *status quo* has been maintained in the interim and the FTC has suffered minimal prejudice.

### 3. A Meritorious Defense to the Complaint

Defendants have also presented potentially meritorious defenses to the complaint. In this context, "meritorious defense" means that a movant should ground its case in "facts which would support a meritorious defense of the action" and offer more than general denials and bare

---

[2] The abrupt withdrawal of Defendants' previous counsel, at Defendants' request, could support a finding that Defendants engaged in a willful default, which would be fatal to their Motion to Vacate. *See Cracco*, 559 F.3d at 631. In addition, the FTC has presented evidence that Defendants are not the neophytes to U.S. litigation that they make themselves out to be. (*See, e.g.*, Zappe Decl., PX 20, Dkt. No. 76-2; Costa Decl. at ¶¶ 1-2, PX 21, Dkt. No. 76-3.) Given the troubling history, the Court cautions Defendants that the Court will not hesitate to impose sanctions of escalating severity if it sees any further evidence of contumacious behavior.

conclusions. *Pretzel & Stouffer*, 28 F.3d at 46. The defense must also be "good at law" in order to "give the factfinder some determination to make." *Bieganek*, 801 F.2d at 882. When it appears "that there is a genuine dispute concerning material facts, it weighs in favor of a trial to decide those factual disputes in preference to judgment by default in which facts cannot be disputed and decided." *Id.*

Defendants have made a showing that there are genuine disputes concerning material facts with respect to their liability in this case. The FTCA forbids "unfair or deceptive acts or practices." 15 U.S.C. § 45(a). "[T]o establish that an act or practice is deceptive, the FTC must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment." *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988). Defendants assert as a defense that there are disclosures on the direct mail forms that inform potential customers that they will be charged for the listing. In light of these disclosures and the general wording of these direct mail pieces, it appears that there is a genuine dispute of material fact that represents a meritorious defense.

The Individual Defendants have an additional meritorious defense to their liability. "An individual may be held liable under the FTCA for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted." *FTC v. Amy Travel Svc., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989). "Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them." *Id.* Although the complaint alleges that each of the Individual Defendants "formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in [the] Complaint," (Compl. at ¶¶ 7-8, Dkt. No. 2.), there is an issue of

material fact as to the extent of the Individual Defendants' knowledge of whether these practices were misrepresentations. *See Amy Travel Svc., Inc.*, 875 F.2d at 573 ("The FTC is required to establish the [individual] defendants had or should have had knowledge or awareness of the misrepresentations.").

Finally, Defendants also have identified meritorious defenses with respect to the damages award in this case. The $9.1 million default judgment was based on the FTC's estimate of Construct Data's total sales revenue from January 1, 2005 through March 14, 2013. (Sec. Supp. Menjivar Decl., PX 10 ¶ 3, Dkt. No. 52-1.) As discussed in Anhorn's declaration, however, 45% of Construct Data's revenues came from outside of the United States. (Anhorn Decl. at ¶ 62, Dkt. No. 62.) Defendants dispute whether the FTC may collect restitution based on revenues earned from non-U.S. sources. The FTC argues that the FTCA expressly prohibits deceptive acts and practices "involving foreign commerce that (i) cause or are likely to cause reasonably foreseeable injury within the United States; or (ii) involve material conduct occurring within the United States," and the available remedies include "restitution to domestic or foreign victims." 15 U.S.C. § 45(a)(4)(A)-(B). But this provision "shall not apply to unfair methods of competition involving commerce with foreign nations" unless that conduct has a "direct, substantial, and reasonably foreseeable" domestic effect. 15 U.S.C. § 45(a)(3). Moreover, in interpreting U.S. legislation there is a presumption that it is meant to apply only within the territorial jurisdiction of the United States. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). This "'presumption is not defeated just because [a statute] specifically addresses [an] issue of extraterritorial application'; it remains instructive in determining the *extent* of the statutory exception." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455-56 (2007) (emphasis in original) (internal citation omitted). Given the statutory language and the presumption against

15

extraterritoriality, Defendants have raised a meritorious defense as to the FTC's damage calculation.

Because the Defendants have made the showing required under Rule 60(b), the Court vacates the default judgment and permanent injunction. However, the preliminary injunction will remain in place.

## II.      Motion to Modify the Asset Freeze

In the Motion to Modify, Defendants ask the Court to modify the asset freeze order to allow (1) Defendants to pay their attorneys' fees, and (2) the Individual Defendants to pay their reasonable living expenses without having to obtain prior written consent from the FTC. Because the Court is vacating the default judgment and permanent injunction, and reinstating the preliminary injunction, the Motion to Modify is construed as directed toward the asset freeze imposed by the preliminary injunction.

The Court may modify an injunction whenever the principles of equity require it to do so. *In re Hendrix*, 986 F.2d 195, 198 (7th Cir. 1993). Generally speaking, asset freezes imposed pursuant to preliminary injunctions in FTC actions allow defendants to pay their reasonable attorneys' fees and costs. *See, e.g., Amy Travel Svc., Inc.*, 875 F.2d at 575-76; *FTC v. Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715, at *6 (N.D. Ill. Aug. 5, 1999); *see also FTC v. QT, Inc.*, 467 F. Supp. 2d 863, 866 (N.D. Ill. 2006) (noting that it is "routine[]" for courts to allow a defendant facing an FTC civil suit to pay their attorneys because this is "necessary to enable defendants to obtain representation" and ensure a defendant may "defend against the FTC's charges."). The FTC's only argument against allowing a modification to the asset freeze that would permit such payments in this case is that it is not appropriate to allow payment of attorneys' fees from otherwise frozen assets when there is a final order in place. But

for the reasons discussed above, the final order imposed by default is now vacated and the parties are instead subject to the terms of the preliminary injunction.

Nonetheless, it would be imprudent to permit Defendants to begin spending otherwise frozen assets—whether for attorneys' fees and costs or living expenses—without first requiring them to provide an accounting of those assets. Indeed, courts frequently condition release of frozen assets to pay attorneys' fees upon compliance with a court order requiring the defendant to disclose its financial information. *See, e.g., Windermere*, 1999 WL 608715, at *6 n.5 (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79–80 (3rd Cir.1993); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1032 & n.10 (7th Cir. 1988)); *QT, Inc.*, 467 F. Supp. 2d at 866. The same principle applies with respect to the Individual Defendants' request to use frozen assets to pay their living expenses. As it stands, this Court has no information regarding the nature and value of Defendants' assets or, more importantly, the extent to which permitting Defendants to use those assets to pay attorneys' fees and living expenses would diminish the funds available to pay a future judgment in this matter requiring restitution to victims or disgorgement of ill-gotten gains.

For this reason, the Motion to Modify is denied without prejudice. Defendants may renew their request after they have complied with Section VIII of the preliminary injunction order, which requires each Defendant to serve FTC counsel with (1) a completed financial statement; (2) a statement of all payments, transfers, or assignments of funds, assets, or property worth $5,000 or more since January 1, 2011, and (3) a detailed accounting of all gross and net profits obtained from, derived from, or related in any way to the offering for sale or sale of Internet listings.  In addition to the requirement in the preliminary injunction order that Defendants serve these materials on counsel for the FTC, Defendants also will be required to provide this

information to the Court. Once Defendants have demonstrated compliance with Section VIII, the Court will be receptive to a petition for the release of funds to pay reasonable attorneys' fees and costs, as well as reasonable living expenses.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Vacate Default Judgment and Order for Permanent Injunction and Other Relief (Dkt. No. 57) is granted. The Court vacates the default judgment and order of permanent injunction (Dkt. No. 55), and reinstates the preliminary injunction order (Dkt. No. 20). The FTC is granted leave to file a motion requesting that alternative sanctions be levied upon Defendants as a result of their abortive default. The Court denies, without prejudice, Defendants' Motion to Modify the Asset Freeze Order (Dkt. No. 68). Defendants may renew their motion for modification of the asset freeze order to request the release of funds to pay Defendants' reasonable attorneys' fees and expenses and to pay the Individual Defendants' reasonable living expenses, after demonstrating compliance with Section VIII of the preliminary injunction order.

ENTERED:

Dated: December 11, 2014

Andrea R. Wood
United States District Judge